## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**KAHAN S. DHILLON, JR.**     *
822 Guilford Avenue
Baltimore, MD 21202     *

    *Plaintiff,*     *

v.     *     **Civil Action No.**

**JOHN C. WOBENSMITH**, in his     *
    Official Capacity as
    Secretary of State for Maryland     *
16 Francis St.
Annapolis, MD 21401     *

and     *

**LINDA H. LAMONE**, in her     *
    Official Capacity as
    State Administrator of Elections     *
Maryland State Board of Elections
151 West Street, Suite 200     *
Annapolis, Maryland 21401
    *

    *Defendants*.     *   *   *   *   *   *   *   *

## VERIFIED COMPLAINT FOR EMERGENCY
## DECLARATORY AND PRELIMINARY INJUNCTIVE RELIEF

Kahan S. Dhillon, Jr., by his undersigned attorneys, hereby files the following Verified Complaint for Emergency Declaratory and Preliminary Injunctive Relief against John C. Wobensmith, in his Official Capacity as Secretary of State for Maryland, and Linda H. Lamone, in her Official Capacity as State Administrator of Elections, Maryland Board of Elections, and alleges:

## INTRODUCTION

1.     This action seeks to enjoin or modify Maryland law that governs Independent and minor party candidates by mandating each candidate file ballot access petitions with a set number of signatures in order to obtain access to the general election ballot in any election.

2.     This action seeks to enable and require the Defendants to accommodate the constitutional rights and interests of the Plaintiff, other candidates, and the general public in light of the current public health pandemic caused by the novel coronavirus and Governor Hogan's emergency orders.

3.     This action further seeks to vindicate the rights protected by the First and Fourteenth Amendments to the U.S. Constitution and is brought under 42 U.S.C. § 1983. This court has jurisdiction over this civil rights action under 28 U.S.C. §§ 1331 and 1343.

4.     Under current circumstances, the Plaintiff and Maryland voters are forced to choose between their health and their rights to petition and vote for a candidate of their choosing. Reforms and modifications to Maryland's election procedures in light of the COVID-19 pandemic are appropriate.

## **<u>PARTIES</u>**

5.     Kahan S. Dhillon, Jr. ("Dhillon") is a Maryland registered voter and has filed a Declaration of Intent to seek nomination for the office of Mayor of Baltimore City, Maryland, in the November 2020 General Election.

6.     John C. Wobensmith, ("Secretary Wobensmith") is Secretary of State for Maryland. ("SOS"), and the Plaintiff brings this action against him in his Official Capacity. The

2

Secretary of State's office handles certain executive functions within the state.

7.     Linda H. Lamone ("Administrator Lamone"), is State Administrator of Elections, Maryland Board of Elections ("State Board" or "SBE"), and the Plaintiff brings this action against her in her Official Capacity.

## JURISDICTION AND VENUE

8.     This court also has jurisdiction over the subject matter of this action by virtue of U.S.C. §§ 1331 (federal question jurisdiction), 2201 (authorizing declaratory relief)  and 2202 (authorizing injunctive relief); and 1367 (supplemental jurisdiction) to declare the rights of the parties and to grant all further relief found necessary and proper.

9.     Venue is proper in the Northern Division, District of Maryland pursuant to 28 U.S.C. § 1391(a) because the Defendants are subject to personal jurisdiction within the Northern Division, District of Maryland, and the events that give rise to this action occurred within the Northern Division, District of Maryland.

## FACTUAL BACKGROUND

10.     In December 2019, an outbreak of respiratory disease, now known as COVID-19 or coronavirus, emerged in Wuhan, China.

11.     Since then, the outbreak has spread to the majority of the world, with the United States reporting the most cases.

12.     On March 5, 2020, Maryland Governor Lawrence J. Hogan ("Governor Hogan") issued a Proclamation declaring a State of Emergency and Existence of Catastrophic Health Emergency due to the COVID-19 pandemic.

> COVID-19 is a highly infectious respiratory disease that spreads easily from
> person to person, physically contaminates property by attaching to surfaces for

3

prolonged periods of time, and may result in serious illness or death;

WHEREAS, COVID-19 is a public health catastrophe and has been confirmed in all Maryland counties;

WHEREAS, the spread of COVID-19 in the state continues to pose an immediate threat to all Marylanders of extensive loss of life or serious disability;

WHEREAS the emergency conditions, state of emergency, and catastrophic health emergency continue to exist;

WHEREAS all levels of government in Maryland must deploy resources to protect public health and safety;

WHEREAS COVID-19, the state of emergency and the catastrophic health emergency, and the State's emergency actions in response have impaired the ability of governmental officials, employees, and volunteers to conduct the canvass of ballots and observation of each part of the canvass in accordance with the existing statutory and legal systems and procedures;

See https://governor.maryland.gov/wp-content/uploads/2020/06/4th-Renewal-of-State-of-Emergency-6.3.20.pdf

13.     Governor Hogan renewed his Proclamation declaring a State of Emergency and Existence of Catastrophic Health Emergency on March 17, 2020, April 10, 2020, May 6, 2020, June 3, 2020, and July 1, 2020.

14.     Governor Hogan issued subsequent orders closing non-essential businesses, forbidding large gathering of people, and requiring Marylanders to stay at home. The stay at home order was in effect statewide from March 30, 2020, through May 15, 2020.

15.     On May 13, 2020, Governor Hogan issued Order 20-05-13-01, which allowed certain businesses to reopen and gatherings to occur. However, Order 20-05-13-01 significantly limited large gatherings and allowed local jurisdictions to impose more stringent orders. Governor Hogan's Order 20-06-10- 01, continues to strongly recommend that "all Marylanders continue following the most current guidance from CDC and MDH regarding social distancing, including, without limitation, avoidance of large gatherings and crowded places. All of

Governor Hogan's COVIC- 19 pandemic orders can be found at

https://governor.maryland.gov/COVID-19-pandemic¬orders-and-guidance.

16.     Subsequent to Governor Hogan's issuance of Order 20-05-13-01, Baltimore City,

Baltimore County, and Howard County entered more restrictive orders. Baltimore City was

under a stay at home order until June 8, 2020. Further, Baltimore City Mayor Bernard "Jack"

Young canceled all large events in Baltimore City, including Fourth of July fireworks and

Artscape, through August 31, 2020.[1]

17.     As of July 27, 2020, Maryland recorded 85,436 confirmed cases of coronavirus

and 3,447 confirmed deaths.[2]

18.     As of July 27, 2020, Baltimore City has 10,579 confirmed cases and 401 deaths[3],

making it the fourth highest county in Maryland, per capita, for confirmed cases and deaths, at

156 per 100,000 residents.[4]

19.     EL §§ 5-703(d), 5-703(e), and 5-703(f) require that unaffiliated candidates

submit petition signatures from 1% of the total number of registered voters who are eligible to

vote for the office for which he seeks nomination (*i.e.*, 3,889 signatures) by first Monday in

August in the year in which the General Election is held. The first Monday in August in 2020 is

August 3, 2020.

20.     On April 22, 2020, due to the pandemic restrictions imposed on the candidates,

the State Board of Elections promulgated SBE Policy 2020-01, which authorized the use of

electronic signatures on petitions for recognition of political parties, petitions for nomination as

an unaffiliated candidate, and petitions to place questions on the November 3, 2020, Presidential

---

[1] https://coronavirus.baltimorecity.gov/information-general-public
[2] https://www.nytimes.com/interactive/2020/us/maryland-coronavirus-cases.html
[3] https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6
[4] https://coronavirus.maryland.gov/

General Election ballot.

21.     While SBE policy was created to facilitate the gathering of signatures during the COVID-19 pandemic, limitations existed, which essentially prohibited an unaffiliated candidate from completing the signature requirement.

22.     On July 7, 2020, Amber Ivey, an unaffiliated candidate seeking election to the United States House of Representatives representing Maryland's 7th Congressional District, filed an action in this court against the State Administrator of Elections, seeking declaratory and injunctive relief stemming from the election law requirements imposed by Md. Code Ann., Elec. Law § 5-703(e).

23.     Ms. Ivey alleged that governmental restrictions imposed in response to the COVID-19 pandemic hindered her efforts to gather signatures on her petition to obtain the nomination as an unaffiliated candidate.

24.     Ms. Ivey and her campaign were unable to collect any in-person petition signatures until June 2020 due to the many stay at home orders imposed by Governor Hogan and local governments.

25.     On July 20, 2020, after reaching a settlement, this court entered a Consent Judgment declaring the number of signatures of eligible Maryland registered voters required for candidates who seek nomination by petition pursuant to Elec. Law § 5-703(e) is reduced by 50% to the lesser of 5,000 registered voters or 0.5% of the total number of registered voters who are eligible to vote for the office for which the nomination by petition is sought, except that the petitions shall be signed by at least 125 registered voters who are eligible to vote for the office in question.

## DHILLON'S PURSUIT TO BE MAYOR OF BALTIMORE CITY

26.     Mr. Dhillon filed a timely Declaration of Intent to seek nomination for the office of Mayor of Baltimore City in the November 2020 General Election, on January 24, 2020.

27.     Mr. Dhillon, running as an unaffiliated candidate, created his campaign, Dhillon For Mayor (DFM) and hired team members.

28.     While Mr. Dhillon was aware of the state's rules for unaffiliated candidates, he welcomed the challenge to get onto the ballot and, if successful, provide the citizens of Baltimore with fresh leadership and a path to cleaning up the city's crime.

29.     Unlike partisan candidates, those running as unaffiliated must follow the rules that often create limitations and barriers that prohibit candidates from entering the race. History details how well funded, staffed, and structured parties use arcane rules and outdated laws to make sure most voters only have two choices; affiliated candidates.

30.     One such law requires that candidates gather signatures from registered voters in the area they hope to represent to appear on the ballot.

31.     Mr. Dhillon's candidacy successfully launched, and, through interaction with the public, he began securing a foothold in the race and took strides to meet the requirements imposed by the election laws.

32.     DFM initiated multiple fundraisers which were necessary to run a campaign against well funded affiliated candidates.

33.     However, almost immediately, his candidacy was placed on hold by Governor Hogan's Pandemic Orders, which, while reasonable and necessary to ensure the health and safety of the residents of Maryland and Baltimore City, had a profound impact on the ability of an independent, non-party candidate to appear on the general election ballot in November.

34.     After unsuccessfully trying to continue his candidacy by "virtually" communicating with potential voters, on April 21, 2020, Mr. Dhillon sent Michael R. Cogan, Chairman of the Maryland State Board of Elections, a letter requesting the State Board of Elections take steps to waive the signature requirement as it pertains to the November 2020 general election. See April 21, 2020, letter to Cogan.

35.     On May 4, 2020, Mr. Dhillon received an email from Jared DeMarinis, Director of Candidacy and Campaign Finance at the State Board of Elections advising that:

> The Governor's March 12 Emergency Order gave State agencies authority to suspend deadlines or other statutory timeframes during this state of emergency. But this does not include the authority to eliminate or reduce petition signature requirements. Separately, the Governor's various election-related orders (March 17 and April 10) authorized the State Board to change the format of, and other requirements for, the special general election for the 7th Congressional District and the presidential primary election, but the petition issues do not relate to these elections.
>
> In each Proclamation, the Governor never conveyed any authority to reduce or eliminate petition signature gathering requirements. One area that the State Board does have discretion over petition is regarding the acceptance of electronic signatures. At the April 22 Board meeting, the Board decided on a temporary basis in response to the COVID-19 health crisis to accept electronic signatures on petitions.  In addition, under Maryland law signatures on a petition are valid for up to two years before the filing date of the last qualifying signature. This means that if you engaged in any signature-gathering activity since January 1, 2019, you would be able to include those signatures on any petition for recognition you file this year.

36.     Mr. Dhillon continued, through a series of emails from May through July with Mr. DeMarinis to obtain clarification and revision on the restrictions imposed by the election laws.

37.     Mr. Dhillon was aware that similar candidates for political positions across the United States had already experienced problems with supportive voters not being able to sign petitions virtually.

38.     Removing the requirement for an ink signature was a step forward for candidates

in the COVID-19 world, but still requires a process that could be cumbersome to some voters and requires access to a personal computer, thereby disenfranchising others. The electronic process also cannot replace the time the party lost in collecting signatures during the pandemic.

39.     On May 11, 2020, Mr. Dhillon requested the Board revisit their refusal to remove the petition signature requirement "or, in the alternative, at least follow the Illinois model and reduce the required signatures to 10% and all for such signature gathering to be accomplished online."

40.     While Governor Hogan lifted the State's stay at home order on May 14, 2020, Mayor Young kept Baltimore City's Order in place until June 19, 2020. However, the phased reopening was limited to several businesses and services.  Mayor Young said, "While our public health data shows promise, I want to be clear – loosening restrictions does not mean that these activities are risk-free. Residents should continue wearing face coverings, practicing social distancing and other mitigation efforts."[5]

41.     In mid-June, 2020, DFM members attempted to canvas areas of the city but were met with multiple negative reactions. Concern from residents ranged from people not willing to come to their doors upon seeing canvassers with masks and clipboards, to residents immediately requesting canvassers leave their property due to fear of COVID-19. On some occasions, residents yelled at canvassers and attempted to blame them for spreading COVID-19. These reactions placed the DFM staff in a position where no longer comfortable with continuing.

42.     Upon not receiving any response to his email to the Board, on June 24, 2020, Mr. Dhillon again requested clarification and guidance. To date, Mr. Dhillon has not received a response from the Board.

---

[5] https://mayor.baltimorecity.gov/news/press-releases/2020-06-22-mayor-bernard-c-%E2%80%9Cjack%E2%80%9D-young-announces-baltimore-city-will-enter

43.     By June 26, 2020, as the restrictions in Baltimore City lessened and limits on outdoor gatherings were reduced, the DFM campaign staff refused to out to go door-to-door to canvas in areas where potential voters usually congregate due to fear of getting the coronavirus. However, even if the DFM staff agreed to canvas and communicate with Baltimore City residents to solicit signatures, most events were canceled through the end of August 2020, and people were not available to meet.

44.     During June 2020, the DFM campaign was only able to collect 208 signatures through the online portal and in person, notwithstanding active solicitation of signatures through texts and calls to voters, purchased social media ads on Instagram and Facebook, and direct mail.

45.     However, in the last two weeks, the average daily new coronavirus infections have been steadily trending upward since early July. On July 19, 2020, the state reported 925 new cases, the highest number since late May. Slowly restaurants and other establishments were forced to reclose for fear of fueling the COVID-19 outbreak.

46.     Although DFM continues to obtain signatures, people are very wary of interacting with canvassers, and this number is significantly lower than what the campaign would expect without the fear of COVID-19.

47.     Further, because Mr. Dhillon is unaffiliated, he does not have the amount of staff that affiliated candidates have to cross the COVID-19 barrier. Also, affiliated candidates do not need to comply with the restrictions imposed on independent candidates.

48.     Since early March 2020, it has been virtually impossible for DFM to collect signatures due to governmental restrictions. Notwithstanding Governor Hogan's Order 2020-05-13-01, this impossibility continues and likely will continue through August 3, 2020.

49.     Notwithstanding all best efforts, due to the factors related to the COVID-19

pandemic, Mr. Dhillon cannot gain access to the ballot if the signature requirement were to remain in effect or the same as in an election year not marred by the pandemic.

50.    On July 27, 2020, Lawrence Greenberg, counsel for Mr. Dhillon, communicated with Andrea Trento, Assistant Attorney General, who represented the State Administrator of Elections in *Ivey v. Lamone,* and requested the Board extend the August 3, 2020, deadline by thirty days. Mr. Trento indicated he would speak with the Board and would respond.

51.    While Mr. Dhillon intends on continuing his push to obtain the requisite amount of signatures by August 3, 2020, most of the citizens in Baltimore City do not want canvassers to come near them due to COVID-10; residents specifically asked canvassers not to come on their porches.

52.    Further, to obtain a physical signature on a petition, a solicitor must hand the petition and a pen to a prospective signer and then retrieve the signed petition. In the alternative, a solicitor would be required to hand a computerized device (cell phone, ipad, computer) to the prospective signer and then risk the transmittal of the virus. Such exchanges are impossible or strongly discouraged under the social distancing guidelines from the Centers for Disease Control, which provide, in part:

> Social distancing, also called "physical distancing," means keeping a safe space between yourself and other people who are not from your household.
>
> To practice social or physical distancing, stay at least 6 feet (about 2 arms' length) from other people who are not from your household in both indoor and outdoor spaces.
> Social distancing should be practiced in combination with other everyday preventive actions to reduce the spread of COVID19, including wearing cloth face coverings, avoiding touching your face with unwashed hands, and frequently washing your hands with soap and water for at least 20 seconds.
>
> https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last accessed July 6, 2020)

## ARGUMENT

53.     Mr. Dhillon incorporates the allegations contained above as if fully set forth herein.

54.     Federal courts have ruled in the past that if ballot access is impossible, or virtually impossible. A party or a candidate who wants to be on the ballot sues and shows evidence of a modicum of support; then, the court should put that party or candidate on the ballot even if it submits few if any signatures or does no other substantial work to qualify.

55.     The U.S. Supreme Court and the Court of Appeals of Maryland have both recognized that "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." Burruss v. Bd. of Cty. Commissioners of Frederick Cty., 427 Md. 231, 256 (2012) (quoting Bullock v. Carter, 405 U.S. 134, 142-43 (1972)).

56.      U.S. Supreme Court examples of candidates' issues with election requirements: (1) Eugene McCarthy was put on the Texas ballot as an independent presidential candidate in 1976 even though he did not submit any signatures. McCarthy v Briscoe, 429 US 1317 (1976); (2) the National Democratic Party of Alabama (an African-American Party not affiliated with the Democratic Party) was put on the ballot for county office in Hadnott v Amos, 394 US 358 (1969); (3) an independent US Senate candidate, Clifton Whitley, was put on the ballot by a 3-judge US District Court Judge in Mississippi in 1966, and the U.S. Supreme Court affirmed that decision, Allan v State Board of Elections, 393 U.S. 544 (1969); (4) several minor parties were put on the Michigan ballot in 1976 by a 3-judge U.S. District Court, and the U.S. Supreme Court summarily affirmed that decision, 430 US 924 (1977).

57.     While the Maryland Election Law signature requirement, on its face, appears to

affect only the non-party candidates themselves, the true impact falls on the voters of Baltimore
City, as it curtails their electoral choices

58.     Certain burdens on candidates' access to the ballot, and the concomitant limitation
on voters' choice of candidates, of course, may be appropriate. But "[i]n approaching candidate
restrictions, it is essential to examine in a realistic light the extent and nature of their impact on
voters." Id. at 257.

59.     The more severe the burden, the more exacting courts will be in requiring the state
to justify the interest it has in imposing the burden on ballot access. Id. at 258 (quoting Burdick v.
Takushi, 504 U.S. 428, 434 (1992), stating that courts should weigh "the character and magnitude
of the asserted injury" to the protected constitutional rights against the interests put forth by the
State, taking into consideration "the extent to which those interests make it necessary to burden
the plaintiff's rights.").

60.     In addressing the effect on voters of potential candidates being precluded from
running for office, the Court of Appeals has held that such effect "is neither incidental nor remote"
and "voters are substantially limited in their choice of candidates." Maryland Green Party v.
Maryland Bd. of Elections, 377 Md. 127, 163 (2003).

61.     In normal non-COVID-19 times, imposing a signature requirement for candidates
not affiliated with a majority political party and who are not vetted through a rigorous primary
campaign can be a valid basis for a state to ensure that such candidates have sufficient public
support to warrant their inclusion on the general election ballot. See Jenness v. Fortson, 403 U.S.
431, 442, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) ("There is surely an important state interest in
requiring some preliminary showing of a significant modicum of support before printing the name
of a . . . candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and

even frustration of the democratic process at the general election.").

62.     But these are not normal times. The confluence of the signature requirement for petition candidates, the Stay at Home Order, and likelihood that restrictions on public gatherings will continue well into the fall make it impossible for an independent, non-party candidate such as Mr. Dhillon to appear on the ballot in November, thereby depriving Baltimore City voters of the option of voting for someone not beholden to one of the two major political parties.

63.     The Massachusetts Supreme Judicial Court held that Massachusetts's signature requirement imposed a severe burden on candidates' access to the ballot, the pandemic has created a situation in which "candidates could not safely and reasonably gather voter signatures in the usual ways, namely, going to places where large numbers of potential registered voters are likely to be, such as town centers, malls, grocery stores, or political meetings." Goldstein v. Secretary of the Commonwealth, No. SJC-12931, 2020 WL 1903931, at *5 (Mass. April 17, 2020).

64.     The United States District Court for the Northern District Of Illinois addressed the signature requirement in Libertarian Party of Illinois, et al. v. J.B. Pritzker, et al. and held:

> There is little judicial guidance regarding how to measure whether a new party or independent candidate has demonstrated a modicum of public support sufficient to warrant ballot access. Instead of relying on standards such as the reputation or media coverage of individual candidates, see, e.g., McCarthy v. Briscoe, 429 U.S. 1317, 1323 (1976) (Powell, J., in chambers), Illinois, like other states, measures support through signature-gathering. Even under normal conditions, the ultimate number of signatures a candidate must gather will vary widely because the signature requirement is, with some exceptions, based on voter turnout in the previous election. See Jones, 921 F. Supp. 2d at 899. Suspending entirely the signature requirement without requiring candidates to otherwise demonstrate historical support would, however, extend far beyond these typical variations. See Munro, 479 U.S. at 197 (noting that states need not provide automatic ballot access).
>
> The parties' agreed order, permitting ballot access for previously-qualifying new party and independent candidates, and loosening the statutory signature requirements for other new party and independent candidates, establishes a

measurable standard that the State can use to determine which candidates are eligible to be placed on the ballot in the unique context of this election. The court notes that in order to respect social distancing guidelines implemented in response to the COVID-19 pandemic, numerous states have likewise reduced the number of signatures required for a candidate to be placed on the ballot. See, e.g., Esshaki v. Whitmer, No. 2:20-CV-10831-TGB, 2020 WL 1910154, at *12 (E.D. Mich. Apr. 20, 2020) (reducing the statutory signature requirement by 50 percent); Goldstein v. Sec'y of Commonwealth, No. SJC-12931, 2020 WL 1903931, at *9 (Mass. Apr. 17, 2020) (same); N.Y. Exec. Order No. 202.2 (Mar. 14, 2020) (reducing the statutory signature requirement to 30 percent of normal); H. 681, 2019–2020 Gen. Assemb., Adjourned Sess. (Vt. 2020) (suspending the statutory signature requirement entirely). **Reducing the required number of signatures to 10 percent accommodates the fact that Plaintiffs have not been able to rely on their usual signature-gathering methods for the 2020 general election ballot because the window for collecting signatures in Illinois was slated to begin on March 24, 2020, after the stay-at-home order took effect**. Cf. Goldstein, 2020 WL 1903931, at *9.

65.     In Maryland, voters congregating in such places not only jeopardizes public health but exposes them to possible criminal liability.

66.     While the Stay-at-Home Order has been lifted, the pandemic is fluid and ever-changing. The Centers for Disease Control and Prevention have advised that social distancing—i.e., maintaining a minimum of 6-feet of distance from others—will need to remain in effect to slow the spread of the virus. Also, the expected lack of sufficient testing likely will depress the willingness of Baltimore City residents to assemble in public places or open their doors to canvassing strangers.

67.     As such, Mr. Dhillon's ability to gather signatures will continue to be stymied, as he and his staff will not be able to safely approach Baltimore City residents to obtain and observe the signatures. Moreover, the possibly widespread prevalence of asymptomatic infections means that his campaign staff and Mr. Dhillon might be unwittingly spreading the virus throughout the city as they seek to meet the requirements of the Maryland Election Law.

68.     Apart from judicial relief, the Plaintiff has no way to exercise his right to petition

and speech without jeopardizing his, his staff's, and the public's health and health. Granting Mr.

Dhillon's injunctive relief is in the public interest because, as the Supreme Court has observed,

"all political ideas cannot and should not be channeled into the programs of our two major

parties." Williams v. Rhodes, 393 U.S. 23, 39 (1968) (citation omitted).

69.     Yet that is precisely what will happen in Maryland, due to the COVID-19

pandemic and Governor Hogan's ensuing executive orders if independent candidates, such as Mr.

Dhillon, cannot collect sufficient signatures to appear on the General Election ballot. Further, "in

the absence of legitimate, countervailing concerns," the Third Circuit has concluded, "the public

interest clearly favors the protection of constitutional rights, including the voting and associational

rights of alternative political parties, their candidates and their potential supporters." Council of

Alternative Political Parties, 121 F.3d at 883-84.

70.     The harm caused by Defendants to Plaintiffs is irreparable. In First Amendment

cases, irreparable harm is presumed. Elrod v. Burns, 427 U.S. 347, 373 (1976). If the political

party Plaintiff cannot appear on the November 2020 General Election ballot, that electoral

opportunity never can be regained. The burden on the Defendants to lower the signature

requirement is minimal. The Defendants' interest in regulating elections would not be

significantly impacted by allowing political parties, who have regularly appeared on the ballot in

recent elections, to appear again on the 2020 General Election ballot.

## COUNT I
## FIRST AMENDMENT – DECLARATORY AND INJUNCTIVE RELIEF

71.     Mr. Dhillon incorporates the allegations contained above as if fully set forth

herein.

72.     Injunction is an exceptional remedy, but a court may issue a temporary restraining

order if it finds that specific verified facts clearly show that immediate and irreparable injury, loss,

or damage will result before notice to the adverse party and the opportunity for a hearing on a preliminary injunction. Fed. R. Civ. P. 65(b). Plaintiff certifies by his undersigned counsel that he has already provided notice to counsel for the State Board of this request for a temporary restraining order and preliminary injunction.

73. A court may enter a preliminary injunction if the party seeking the injunction can make a clear showing that it is entitled to relief. Winter v. Natural Resources Defense Council, 555 U.S. 7, 129 S.Ct. 365, 375-76 (2008); Real Truth About Obama, Inc. v. Federal Election Commission, 575 F.3d 342, 345-46 (4th Cir. 2009);1 see also, Holbrook v. Univ. of Virginia, 706 F. Supp. 2d 652, 654 (W.D. Va. 2010) (a preliminary injunction should be granted "if the moving party clearly establishes entitlement to the relief sought.") (quotations omitted).

74. Under current circumstances, the requirements of EL §§ 5-703(d), 5-703(e), and 5-703(f) that Mr. Dhillon submit petition signatures from .05% of the total number of registered voters in Baltimore City by August 3, 2020, violates the rights guaranteed to him by the First Amendment to the United States Constitution and the Fourteenth Amendment to the United States Constitution.

75. If Maryland follows the precedence set by the Illinois court in Libertarian Party of Illinois, et al. v. J.B. Pritzker, et al., independent candidates would only need to secure approximately 400 signatures.

76. A real and actual controversy exists between the parties.

77. The Defendants have less restrictive means by which SBE's interests can be met.

78. Mr. Dhillon has no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing and irreparable harm to his constitutional rights.

79.     Mr. Dhillon has no adequate remedy at law other than this action for declaratory and equitable relief.

80.     Mr. Dhillon is suffering irreparable harm as a result of the violations complained of herein, and that harm will continue unless declared unlawful and enjoined by this court. The harm that he will suffer in the absence of the requested relief is plain: he will be excluded from Maryland's November 3, 2020, General Election ballot.

WHEREFORE, Mr. Dhillon requests that the court:

A.     Issue a preliminary injunction on an expedited basis pursuant to Fed. R. Civ. P. 65(a), and ultimately a permanent injunction, prohibiting the strict enforcement of EL §§ 5-703(d), 5-703(e), and 5-703(f), and directing the Defendants to place Mr. Dhillon's name on the 2020 General Election ballot for the office of Mayor of Baltimore City if he submits a petition with 0.1% of the total number of registered voters in Baltimore City who are eligible to vote for Mayor *on or before* August 28, 2020; or, in the alternative

B.     Issue a declaratory judgment stating that in light of the current public health emergency caused by COVID-19, the orders of Governor Hogan and Baltimore City requiring citizens to remain in their homes and restricting public gatherings, and the Centers for Disease Control social distancing guidelines, Maryland's signature requirements for independent candidates cannot be constitutionally enforced under the First Amendment;

C.     Order the Defendants to pay to Plaintiffs their costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

D.     Either ruling by this court applies to all candidates in the 2020 election;

E.     Grant such other relief as this court deems just and appropriate.

## COUNT II
## RIGHT TO EQUAL PROTECTION AND DUE PROCESS

81.     The allegations contained in all preceding paragraphs are incorporated here by reference.

82.     Under the present circumstances, Maryland's petition collection requirements unduly burden and violate Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution as well as Article I, Section 2, Article III, Section 3, Article VII, Section 11, and Article XIV, Section 3 of Maryland Constitution.

83.     A real and actual controversy exists between the parties.

84.     Plaintiff has no actual remedy at law other than this action.

85.     Plaintiff is suffering and will continue to suffer irreparable harm until he obtains relief from this court.

WHEREFORE, Plaintiff respectfully requests that this court:

A. Assume original jurisdiction over this matter;

B. Issue a temporary restraining order and/or preliminary injunction

(i) enjoining or modifying enforcement of Maryland's petition collection requirements for Maryland's November 3, 2020, general election; and

(ii) enabling and requiring the Defendants to allow for petitions to be submitted electronically via names of qualified electors collected by an online form to be created by the Secretary of State; extend the August 3, 2020 deadline to August 28, 2020; and reduce to 0.1% the number of signatures required to qualify for the general election ballot or some percentage of required signatures necessary to demonstrate substantial public support;

C. Issue a declaratory judgment stating that, in light of the current public health emergency caused by the novel coronavirus and executive orders requiring that Baltimore citizens follow CDC guidelines, Maryland's petition collection requirements for the general

election cannot be constitutionally enforced;

      D. Issue a permanent injunction prohibiting enforcement of Maryland's petition

collection requirements for the November 3, 2020, general election;

      E. Order Defendants to pay to Plaintiffs their costs and reasonable attorneys' fees under

42 U.S.C. § 1988(b);

      F. Grant such other relief as this court deems appropriate.


Dated: July 28, 2020               Respectfully submitted,

                               *  /s/  Lawrence S. Greenberg*
                              Lawrence S. Greenberg, Bar Number: 23642
                              Greenberg Law Office
                              6. E. Biddle St.
                              Baltimore, Maryland  21202
                              Telephone: 410.539.5250
                              Facsimile: 410.625.7891
                              larry@greenberglawyers.com


                               *  /s/  Mandeep Chhabra*
                              Mandeep Chhabra, Bar Number: 26446
                              Cochran and Chhabra
                              116 B Cathedral Street
                              Annapolis, MD 21401
                              Telephone: 410.268.5515
                              Facsimile: 410.268.2139
                              mandeep@cochranandchhabra.com

                              *Counsel for Kahan S. Dhillon, Jr., Plaintiff*

## VERIFICATION OF KAHAN S. DHILLON, JR.

I, Kahan S. Dhillon, Jr., hereby affirm under the penalties of perjury:

1. I am over the age of 18 and competent to testify.

2. I am the Plaintiff in the above-captioned case.

3. I have read the factual allegations in the foregoing Verified Complaint.

4. Based upon my personal knowledge, the factual allegations are true and correct.

Dated: July 28, 2020

_____
Kahan S. Dhillon, Jr.